# Exhibit A

This case has been designated as an eFiling case. To review a copy of the Notice of Mandatory eFiling visit www.oakgov.com/clerkrod/Pages/efiling.

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

STATE OF MICHIGAN

OAKLAND COUNTY CIRCUIT COURT

NATIONAL SHOPMEN PENSION FUND,
Individually and on Behalf of All Others
Similarly Situated,

                Plaintiff,

vs.

ALLY FINANCIAL INC., MICHAEL A.
CARPENTER, CHRISTOPHER A. HALMY,
DAVID J. DeBRUNNER, FRANKLIN W.
HOBBS, ROBERT T. BLAKELY, MAYREE
C. CLARK, STEPHEN A. FEINBERG, KIM
S. FENNEBRESQUE, GERALD
GREENWALD, MARJORIE MAGNER,
MATTHEW PENDO, BRIAN P.
MacDONALD, HENRY S. MILLER,
CITIGROUP GLOBAL MARKETS INC.,
GOLDMAN, SACHS & CO., MORGAN
STANLEY & CO. LLC, BARCLAYS
CAPITAL INC., MERRILL LYNCH,
PIERCE, FENNER & SMITH
INCORPORATED, DEUTSCHE BANK
SECURITIES INC. and J.P. MORGAN
SECURITIES LLC.

                Defendants.

Case No. 2017-156719-CB

Hon. JUDGE ALEXANDER

This case qualifies for the Business Court pursuant to MCL §600.8031(c). Jurisdiction and Venue are proper in the Business Court pursuant to MCL §600.8035(1) & (2)

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

DEMAND FOR JURY TRIAL

THE MILLER LAW FIRM, P.C.
E. POWELL MILLER (P39487)
SHARON S. ALMONRODE (P33938)
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: 248/841-2200
248/652-2852 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

[Additional counsel appear on signature page.]

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge. On October 21, 2016, a related putative class action was filed in Wayne County Circuit Court, Case No. 16-013616-CZ, which was subsequently removed to the United States District Court for the Eastern District of Michigan. Plaintiff in that case filed a motion to remand back to Michigan state court. See Motion to Remand, Bucks County Emps. Ret. Fund v. Ally Financial Inc., No. 2:16-cv-14104-GAD-MKM (E.D. Mich. Dec. 20, 2016), Dkt. 48.

By:   /s/ E. Powell Miller
      _____
      E. Powell Miller (P39487)

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Ally Financial Inc. ("Ally" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased Ally common stock in or traceable to the Company's initial public offering ("IPO") on or about April 11, 2014, seeking to pursue remedies under the Securities Act of 1933 ("Securities Act") against Ally, certain of Ally's directors and/or officers and the underwriters of the IPO.

2.      Defendant Ally is one of the largest automotive financial services providers in the world. Formerly known as the General Motors Acceptance Corporation, or "GMAC," Ally began as the in-house financial services arm of automobile manufacturer General Motors Co. ("GM"). Ally was spun off from GM in 2006, although GM maintained a minority stake in the Company until the end of 2013.

3.      Historically Ally offered mortgage origination and related services through its GMAC ResCap, Inc. ("ResCap") subsidiary, which included the issuance and securitization of subprime mortgage loans in the lead-up to the 2008 credit crisis. The types of subprime lending and securitization practices Ally was engaged in have been heavily criticized as precipitating the credit

- 1 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

crisis, because they concealed and magnified the credit risks associated with poor quality loans by "bundling" such loans into collateralized securities with higher credit ratings and obscuring deficient underwriting and loan origination practices. After housing prices collapsed, and the value of many subprime loans plummeted, Ally was threatened with insolvency, which necessitated a $17 billion bailout by the federal government in December 2008 through the U.S. Treasury's Troubled Asset Relief Program ("TARP"). As a result, the U.S. federal government took a majority stake in the Company in exchange for rescuing it. Ultimately, the Company's ResCap subsidiary would be forced into bankruptcy and Ally would pay billions of dollars to ResCap's estate in order to resolve claims related to the Company's mortgage practices.

4.      Ally was one of the last companies bailed out by TARP to exit the program. The U.S. federal government sold more than 95 million shares of Ally common stock to the public at a price of $25 per share in the IPO and more than 54.9 million shares of Ally common stock to the public at a price of $23.25 per share in a December 19, 2014 secondary offering (the "Secondary Offering"). These two offerings allowed the U.S. federal government to exit its stake in the Company and were hailed by Ally as allowing it to move on from its checkered past.

5.      During a February 6, 2014 conference call in the lead-up to the IPO, Ally's Chief Executive Officer ("CEO") at the time, defendant Michael A. Carpenter ("Carpenter"), highlighted "the change in attitude in the Company, which is we are very much moving from defense. We're moving from cleaning up the sins of the past, if you will, . . . and we are very much moving from defense to offense at this point." These words were particularly important to investors, not only because of the financial and regulatory fallout from Ally's subprime mortgage lending and securitization practices, but also because just before, in December 2013, the Company had paid $98 million to settle claims by the Consumer Financial Protection Bureau ("CFPB") and U.S. Department of Justice ("DOJ") that Ally had engaged in discriminatory lending practices in violation of federal law.

6.      The registration statement and prospectus (collectively, the "Offering Documents") issued in connection with the IPO were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary in order to make the statements

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

made not misleading and were not prepared in accordance with the rules and regulations governing the preparation of such documents. Specifically, the Offering Documents failed to disclose: (1) the severity of rising subprime auto loan delinquency rates; (2) deficient underwriting measures employed in the origination of Ally's subprime auto loans; (3) predatory lending practices that saddled low-income, unsophisticated and distressed borrowers with loans they could not afford; and (4) excessive risks associated with Ally's subprime lending and securitization practices. Ally was able to raise approximately $2.375 billion in gross proceeds from the IPO.

7.     In October 2014, December 2014 and May 2015, Ally received subpoenas and information requests regarding its subprime auto financing and related securitization activities from the SEC, the DOJ and the New York Department of Financial Services, respectively. In March 2015, the U.S. Federal Trade Commission ("FTC") announced the results of Operation Ruse Control, a nation-wide, crossborder crackdown on abusive auto lending and sales practices. Several of the enforcement actions involved dealerships associated with Ally. However, the Company was not accused of any wrongdoing, and its representatives repeatedly stated that Ally employed proper and prudent subprime auto origination and securitization practices that complied with the law and that it had minimal exposure to subprime credit losses.

8.     Then on March 13, 2016, The Wall Street Journal reported, in an article entitled "Subprime Flashback: Early Defaults Are a Warning Sign for Auto Sales," on a sharp uptick in subprime auto loan defaults and how these defaults were impacting the performance of bonds backed by securitized subprime auto loans. The article stated that deteriorating underwriting practices and more liberal credit standards by auto lenders had led to the rising delinquency rate.

9.     The next day, credit rating agency Fitch Ratings issued a press release stating that subprime auto delinquencies had reached 5.16% of all such loans 60 days or more past due in February, which marked an increase of more than 11% year-over-year, eclipsed 2009 recessionary levels, and constituted the highest delinquency rate in twenty years.

10.     On April 26, 2016, Ally reported its first quarter 2016 financial results. The Company revealed that it had begun to significantly pull back on its subprime auto loan originations, to 12.6% of overall originations for the quarter, down from 13.7% the prior quarter, an approximate

- 3 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

8% decrease. On a conference call discussing the results, Ally representatives denied that the pullback had anything to do with a decline in credit quality or the risk of losses from Ally's subprime loan practices.

11.     On June 2, 2016, The Wall Street Journal published an article entitled "J.P. Morgan Chief James Dimon Sounds Alarm on Car Loans." The article reported that Dimon saw subprime risks increasing for auto lenders due to higher default rates, and stated that some auto lenders will get "'hurt'" by their subprime practices. Ally's CEO, Jeffrey Brown ("Brown"), was quoted in the article as downplaying the risks to the Company: "'We know fully what we are originating . . . there are no skeletons in the closet.'" The next day, in an article entitled "Auto financiers tapping the brakes on subprime lending," Automotive News reported that Brown had told the news organization that Ally was "dialing back on lending to consumers at the lower end of the subprime credit score spectrum."

12.     On June 14, 2016, in an article entitled "Credit-Card Warning Sends Synchrony Shares Dropping," The Wall Street Journal reported that "[c]onsumer credit is starting to fray at the edges," and that "[l]enders and credit-ratings firms are warning that . . . auto loans . . . are weakening, suggesting that a new round of borrower delinquencies and losses for financial institutions could be on the way."

13.     On July 11, 2016, in an article entitled "U.S. government worried about risky car loans," CNN Money highlighted a report issued by the Office of the Comptroller of the Currency (the "OCC Report") that cited "'unprecedented'" growth in auto loans. The OCC Report found that, "[i]n addition to the easing of underwriting standards and potential layering of risks (higher loan-to-value ratios combined with longer terms), concentrations in auto loans have been increasing," which "elevated risk results in higher probable credit losses." The OCC Report continued: "Supervisory work to date has noted that some banks' risk management practices have not kept pace with the growth and increasing risk in these portfolios."

14.     In a July 28, 2016 blog entitled "Alarm Bells for Auto Loans," The Wall Street Journal reported that several auto lenders, including Ally, had recently raised "concerns about a growing threat to auto-loan performance: signs that used-car values are weakening." The blog stated

- 4 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

that during Ally's second quarter earnings conference call, the Company's Chief Financial Officer ("CFO"), defendant Christopher A. Halmy ("Halmy"), had "said pressure on used-car prices could grow as cars getting leased now return to the market in three years." A decline in used-car prices would negatively impact auto lenders such as Ally because it would diminish the value of cars used as loan collateral.

15.     In a September 30, 2016 report, analysts at Sandler O'Neill + Partners reported that "[m]onthly securitization data shows loss rate and delinquency rates rising YoY" for two of Ally's primary securitization platforms, which collectively accounted for 20% of Ally's outstanding retail auto loans.

16.     On October 26, 2016, Ally reported its third quarter 2016 financial results. The Company reported third quarter 2016 earnings per share ("EPS") of $0.43 and adjusted EPS of $0.56, substantially below consensus EPS estimates of $0.59. A primary driver of the miss was an increase in loan losses for the quarter, which increased by $86 million sequentially (or 50%) to $258 million. As a result, net income declined sequentially by $136 million (or 39%) to $209 million for the quarter. The Company also disclosed that U.S. auto retail net charge-offs had increased 43 basis points sequentially to 1.37%. As a result, net charge-offs had risen in the quarter to $219 million, up from $148 million for the previous quarter, an increase of 48%.

17.     On November 30, 2016, the Federal Reserve Bank of New York issued a report on rising subprime auto delinquencies. The report stated that auto lending companies had dramatically increased subprime lending over the "past few years." The report noted a "deterioration in the performance of subprime auto loans," which translated into households with "roughly six million individuals at least ninety days late on their auto loan payments." As a result, the report cited subprime auto loans as an area "of significant concern" to the economy, which was "likely to have ongoing consequences for affected households."

18.     As recently as November 8, 2016, Ally stock closed at $16.84 per share, more than 32% below the IPO price of $25 per share.

- 5 -

**JURISDICTION AND VENUE**

19.     This Court has jurisdiction pursuant to Mich. Const. art. 6, §1, MCL §600.605 and §22 of the Securities Act. The case involves a business investment dispute in which the amount in controversy exceeds $25,000. MCL §§8035; 8035(1); 8031; 8033.

20.     The Court has jurisdiction over Ally because its principal place of business is located in the State of Michigan; it carries on a continuous and systematic part of its general business within the state; and it transacts business within the state. MCL §§600.711; 600.715. The Court has jurisdiction over the other corporate defendants as they transacted business within the state and otherwise conducted continuous and systematic business within the state. Id.

21.     The Court has jurisdiction over the individual defendants as they are located within the state of Michigan and/or transacted business within the state and/or acted as a "director, manager, trustee, or other officer of a corporation incorporated under the laws of, or having its principal place of business within this state [Ally]." MCL §§600.701; 600.705(1), (6).

22.     Further, this Court has personal jurisdiction over each of the defendants because they are either citizens of the State of Michigan and/or the claims and allegations asserted herein arise from conduct and actions taken by the defendants within the state of Michigan, including conducting the IPO and preparing and disseminating the Offering Documents alleged herein to be false and/or misleading.

23.     Venue is proper because defendants have places of business in Oakland County, Ally's primary offices for its Dealer Financial Services business and insurance operations are located in Oakland County, and the preparation and dissemination of the inaccurate, misleading and incomplete Offering Documents occurred in part in this County. MCL §§600.1621; 600.1627.

**PARTIES**

24.     Plaintiff National Shopmen Pension Fund purchased shares of Ally stock pursuant/and or traceable to the Offering Documents and was damaged thereby.

25.     Defendant Ally is a financial services company. Ally common stock is listed and trades on the NYSE under the ticker symbol "ALLY."

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

26.     Defendant Carpenter served as CEO and director of Ally until his resignation in February 2015.

27.     Defendant Halmy serves as CFO of Ally.

28.     Defendant David J. DeBrunner ("DeBrunner") serves as Chief Accounting Officer and Corporate Controller of Ally.

29.     Defendants Franklin W. Hobbs ("Hobbs"), Robert T. Blakely ("Blakely"), Mayree C. Clark ("Clark"), Stephen A. Feinberg ("Feinberg"), Kim S. Fennebresque ("Fennebresque"), Gerald Greenwald ("Greenwald"), Marjorie Magner ("Magner"), Matthew Pendo ("Pendo"), Brian P. MacDonald ("MacDonald") and Henry S. Miller ("Miller") serve or served as a member of Ally's Board of Directors.

30.     The defendants referenced above in ¶¶26-29 are referred to herein as the "Individual Defendants." The Individual Defendants signed or authorized the signing of the IPO registration statement ("Registration Statement").

31.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the IPO. In the offering, Citigroup agreed to purchase 14,725,000 Ally shares.

32.     Defendant Goldman, Sachs & Co. ("Goldman") was an underwriter for the IPO. In the offering, Goldman agreed to purchase 14,725,000 Ally shares.

33.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the IPO. In the offering, Morgan Stanley agreed to purchase 14,725,000 Ally shares.

34.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter for the IPO. In the offering, Barclays agreed to purchase 14,725,000 Ally shares.

35.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter for the IPO. In the offering, Merrill Lynch agreed to purchase 4,845,000 Ally shares.

36.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter for the IPO. In the offering, Deutsche Bank agreed to purchase 4,845,000 Ally shares.

37.     Defendant J.P. Morgan Securities LLC ("JP Morgan") was an underwriter for the IPO. In the offering, JP Morgan agreed to purchase 4,845,000 Ally shares.

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

38.     The defendants named in ¶¶31-37 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants drafted and disseminated the Offering Documents. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

39.     Ally, the Individual Defendants and the Underwriter Defendants are collectively referred to herein as "defendants."

## BACKGROUND

40.     Formerly known as GMAC, Ally was founded as the financial services arm of GM. GM sold a majority stake in Ally in 2006 and sold the balance of its position in December 2013. Ally provides a range of financial products and services related to automotive financing, including retail installment sales contracts, loans, leases, financing dealer floorplans, the extension of credit to dealers, fleet financing, vehicle remarketing services, and other financial products and services.

41.     Ally's primary customers are automotive dealers. As part of the process of selling a vehicle, automotive dealers typically enter into retail installment sales contracts and leases with their retail customers. Dealers then select Ally or another automotive finance provider to which they sell the retail installment sales contracts and leases.

42.     At the end of its fiscal 2013, Ally offered financial services and insurance products to approximately 16,000 automotive dealers and approximately 4 million of their retail customers. In 2013, Ally generated $3.4 billion of total revenue from its automotive finance operations, making it one of the largest independent providers of new retail automotive loans to franchised dealers in the United States.

43.     Historically, Ally also offered mortgage origination and related services through its ResCap subsidiary. During the 2008 financial credit crisis, as a result of its subprime mortgage-related exposure from ResCap's mortgage operations, the Company was threatened with insolvency. In December 2008, the U.S. Department of Treasury provided $17 billion to Ally in emergency relief funding through TARP in order to save Ally from bankruptcy and to prevent potentially catastrophic follow-on consequences for the U.S. economy. In exchange for its rescue of the Company, the federal government received a majority ownership stake in Ally.

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

44.    In May 2012, Ally exited the mortgage origination and servicing business after it placed ResCap in Chapter 11 bankruptcy.  Thereafter, Ally's ongoing mortgage operations were limited to the management of its held-for-investment mortgage portfolio.

45.    ResCap's bankruptcy plan was approved in December 2013, pursuant to which Ally agreed to pay more than $2 billion to ResCap's estate, in part to resolve numerous third-party litigation claims related to Ally's subprime mortgage lending and related practices.  In addition, in October 2013, Ally agreed to pay $170 million to settle claims brought by the Federal Housing Finance Agency and the Federal Deposit Insurance Corporation over allegations that Ally made material misrepresentations in its sale of subprime mortgage-backed securities to the government agencies.

46.    In December 2013, Ally entered into consent decrees with the CFPB and DOJ and agreed to pay $98 million to settle claims that it had engaged in discriminatory loan practices in violation of the Equal Credit Opportunity Act, 15 U.S.C. §§1691-1691f, et seq. (the "Consent Orders").  As part of their investigation into Ally's lending practices, the DOJ and CFPB found that Ally had charged approximately 100,000 African-American borrowers, 125,000 Hispanic borrowers and 10,000 Asian/Pacific Islander borrowers between 20 and 29 basis points more in dealer markups than similarly situated non-Hispanic white borrowers. The Consent Orders required Ally to create a compliance plan and to form a compliance committee consisting of Ally and Ally Bank directors to oversee Ally's execution of the Consent Orders' terms. [1]  Ally also agreed to implement policies and procedures designed to ensure that the dealer markup on automobile retail installment contracts would be negotiated in a nondiscriminatory manner and to compensate certain African-American, Hispanic and Asian/Pacific Islander borrowers.  In its statement in connection with the Consent Orders, Ally denied any wrongdoing and maintained that it "treated all of its customers fairly and without regard to race or national origin" and that it was entering into the settlements merely to avoid litigation.

47.    During a February 6, 2014 conference call to discuss the Company's 2013 financial results, defendant Carpenter assured investors that the regulatory scrutiny faced by the Company

---

[1]    Ally Bank is Ally's U.S. banking unit.

- 9 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

would subside moving forward: "[A]s a result of being owned by the government, we have really not been on a level playing field with regard to our regulators. They have held us to a higher standard. We believe that over time that relationship will normalize as the government exits its ownership position." Carpenter stated that he believed this reduced regulatory scrutiny would help "drive [Ally] towards a double-digit return on equity over the next couple of years." Carpenter continued by highlighting "the change in attitude in the Company, which is we are very much moving from defense. *We're moving from cleaning up the sins of the past, if you will, . . . and we are very much moving from defense to offense at this point."*

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN THE IPO OFFERING DOCUMENTS

48.     On or about March 27, 2014, Ally filed the Registration Statement for the IPO on SEC Form S-1/A.

49.     On or about April 11, 2014, Ally filed its prospectus for the IPO with the SEC on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement and which became effective on April 9, 2014. At least 95 million shares of Ally common stock were sold to the public pursuant to the Offering Documents at $25 per share, which generated approximately $2.375 billion in gross offering proceeds.

50.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary in order to make the statements made therein not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

51.     Specifically, the Offering Documents represented that Ally engaged in the "prudent" extension of credit to subprime borrowers; implemented rigorous, comprehensive and effective underwriting, loan origination and risk management practices; and worked with subprime and low-income consumers to ensure that they were treated fairly and in accordance with applicable laws and regulations. These statements were materially false and misleading because they failed to disclose, inter alia: (1) the severity of rising subprime auto loan delinquency rates; (2) deficient underwriting measures employed in the origination of Ally's subprime auto loans; (3) predatory lending practices

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

that saddled low-income, unsophisticated and distressed borrowers with loans they could not afford; and (4) excessive risks associated with Ally's subprime lending and securitization practices.

52.    For example, the Offering Documents stated that the Company was "**prudently expanding**" into subprime lending "in accordance with [the Company's] underwriting standards," as it "continued to expand [its] nonprime automobile financing." Ally defined "nonprime" as "loans with a FICO score (or an equivalent score) at origination of less than 620," i.e., subprime loans.

53.    The Offering Documents also highlighted Ally's purported "rigorous underwriting standards" and "sophisticated risk management" practices as among the Company's enumerated "Strengths," stating in pertinent part:

> **We believe our many years of experience in the automotive industry, and our rigorous underwriting standards result in the high quality of the leases on our balance sheet. We manage risk using our robust combination of credit metrics, including, among others, FICO scores and proprietary vehicle residual value models.** Estimating future vehicle residual values is one of the most important steps of writing a new lease.

54.    The Offering Documents further represented that these "rigorous" standards began at "loan origination" and the "initial underwriting"; involved sophisticated, proprietary quality checks; "continue[d] throughout a borrower's credit cycle"; and were "based on the risk profile of the borrower," among other factors, stating in pertinent:

> **We manage credit risk based on the risk profile of the borrower, the source of repayment, the underlying collateral, and current market conditions.** We monitor the credit risk profile of individual borrowers and the aggregate portfolio of borrowers either within a designated geographic region or a particular product or industry segment. We perform ongoing analyses of the consumer automobile, consumer mortgage, and commercial portfolios using a range of indicators to assess the adequacy of the allowance based on historical and current trends.
>
> *            *            *
>
> **Credit risk management for the consumer portfolio begins with the initial** *underwriting and continues throughout a borrower's credit cycle. **We manage consumer credit risk through our loan origination and underwriting policies, credit approval process, and servicing capabilities**. We use proprietary credit-scoring models to differentiate the expected default rates of credit applicants enabling us to better evaluate credit applications for approval and to tailor the pricing and financing structure according to this assessment of credit risk. We regularly review the performance of the credit scoring models and update them for historical information and current trends.

55.    The Offering Documents further represented that Ally maintained comprehensive risk management policies and practices "across all lines of business" in order "to ensure [credit risks] are

- 11 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

managed in a safe-and-sound manner" and based on "objective" and "independent" assessments of
the borrowers' credit risk.  The Offering Documents stated in pertinent part:

> **Credit risk is monitored by enterprise and line of business committees and the
> Enterprise Risk Management organization. Together they oversee the credit
> decisioning and management processes, and monitor credit risk exposures to
> ensure they are managed in a safe-and-sound manner and are within our risk
> appetite.** In addition, our Loan Review Group provides an independent assessment
> of the quality of our credit portfolios and credit risk management practices, and
> directly reports its findings to the Risk and Compliance Committee of the Board on a
> regular basis.
>
> **To mitigate risk, we have implemented specific policies and practices across
> all lines of business, utilizing both qualitative and quantitative analyses, that
> reflect our commitment to maintain an independent and ongoing assessment of
> credit risk and credit quality. Our policies require an objective and timely
> assessment of the overall quality of the consumer and commercial loan and lease
> portfolios.** This includes the identification of relevant trends that affect the
> collectability of the portfolios, segments of the portfolios that are potential problem
> areas, loans and leases with potential credit weaknesses, as well as stress testing and
> the assessment of the adequacy of internal credit risk policies and procedures to
> monitor compliance with relevant laws and regulations.  In addition, we maintain
> limits and underwriting policies that reflect our risk appetite.

56.      The Offering Documents further described Ally's robust risk management policies
and procedures as a "fundamental component of operating [its] businesses."  The Offering
Documents described Ally's risk practices as being overseen by the highest echelons of Company
management and implemented and continuously monitored by "various risk committees, the
executive leadership team, and [Ally's] associates" in order to ensure that the Company's "risk
strategies, policies, and controls . . . are fundamentally sound and compliant with enterprise risk
management policies and with applicable laws and regulations," "effective" and "strengthen[ed] . . .
throughout the organization."  The Offering Documents stated in pertinent part:

> Managing the risk/reward trade-off is a fundamental component of operating
> our businesses. Our risk management program is overseen by the Ally Board of
> Directors (the Board), various risk committees, the executive leadership team, and
> our associates. The Board sets the risk appetite across our company while the risk
> committees, executive leadership team, and our associates identify and monitor
> potential risks and manage those risks to be within our risk appetite. . . .
>
> While risk oversight is ultimately the responsibility of the Board, our
> governance structure starts within each line of business, including committees
> established to oversee risk in their respective areas. **The lines of business are
> responsible for executing on risk strategies, policies, and controls that are
> fundamentally sound and compliant with enterprise risk management policies and
> with applicable laws and regulations.** The line of business risk committees, which
> report up to the Risk and Compliance Committee of the Board, monitor the

- 12 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

performance within each portfolio and determine whether to amend any risk practices based upon portfolio trends.

In addition, the Enterprise Risk Management and Compliance organizations are accountable for independently identifying, monitoring, measuring, and reporting on our various risks. **In addition, they are responsible for designing an effective risk management framework and structure.** They are also responsible for monitoring that our risks remain within the tolerances established by the Board, developing and maintaining policies, and implementing risk management methodologies.

*    *    *

In addition, our Loan Review Group provides an independent assessment of the quality of Ally's credit risk portfolios and credit risk management practices, and all lines of business and corporate functions that create or influence credit risk are subject to full and unrestricted reviews by the Loan Review Group. This group also is granted free and unrestricted access to any and all of our records, physical properties, technologies, management, and employees and reports its findings directly to the Risk and Compliance Committee. **The findings of this group help to strengthen our risk management practices and processes throughout the organization.**

57.     Moreover, the Offering Documents stated that Ally implemented effective internal controls "designed to provide a sound and well-controlled operational environment" and to maintain a level of "operational risk at appropriate levels based," in part, on Ally's "regulatory environment." The Offering Documents stated in pertinent part:

**To monitor and control such risk, we maintain a system of policies and a control framework designed to provide a sound and well-controlled operational environment.** This framework employs practices and tools designed to maintain risk governance, risk and control assessment and testing, risk monitoring, and transparency through risk reporting mechanisms. **The goal is to maintain operational risk at appropriate levels based on our financial strength, the characteristics of the businesses and the markets in which we operate, and the related competitive and regulatory environment.**

58.     Not only did the Offering Documents fail to disclose the Company's predatory subprime lending practices, they represented that Ally operated in the subprime lending market responsibly with regard to its borrowers' financial well-being, including by providing "ongoing support to customers in financial distress" and otherwise treating subprime borrowers fairly and equitably. The Offering Documents stated in pertinent part:

Additionally, **we utilize numerous collection strategies to mitigate loss and provide ongoing support to customers in financial distress. For automobile loans, we work with customers when they become delinquent on their monthly payment.** In lieu of repossessing their vehicle, we may offer several types of assistance to aid our customers based on their willingness and ability to repay their loan. Loss mitigation may include extension of the loan maturity date and rewriting the loan terms. For mortgage loans, as part of our participation in certain governmental

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

programs, we offer mortgage loan modifications to qualified borrowers. **Numerous initiatives are in place to provide support to our mortgage customers in financial distress, including principal forgiveness, maturity extensions, delinquent interest capitalization, and changes to contractual interest rates**.

59.    The statements referenced above in ¶¶51-58 were inaccurate statements of material fact because they failed to disclose:

(a)    the severity of rising subprime auto loan delinquency rates and the likely impacts of these trends on Ally's business;

(b)    deficient underwriting measures employed in the origination of Ally's subprime auto loans (e.g., the use of inadequate or fraudulent documentation and overly aggressive tactics to extend loans lower down the credit spectrum);

(c)    predatory lending practices employed by Ally and dealerships associated with Ally that saddled low-income, unsophisticated and distressed borrowers with loans they could not afford, thereby increasing the likelihood of default;

(d)    excessive risks and the likelihood of loan losses associated with Ally's subprime lending and securitization practices;

(e)    deficiencies in Ally's internal controls and risk management practices that failed to prevent improper, overly aggressive subprime origination and lending practices and the concealment and amplification of associated risks through loan securitizations; and

(f)    that, as a result of (a)-(e) above, the Company was subject to substantial undisclosed financial and regulatory risks.

60.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires the Offering Documents to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." In addition, the regulation requires the Offering Documents to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues." Id.

61.    The true nature of the Company's subprime lending and securitization practices and their attendant risks was required to be disclosed in the Offering Documents pursuant to 17 C.F.R.

- 14 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

§229.303(a)(3)(ii), because the Company's subprime practices would (and did) have an unfavorable impact on Ally's sales, revenue and income from operations.

## EVENTS FOLLOWING THE IPO

62.     On July 19, 2014, The New York Times ran an exposé on subprime auto lending practices entitled "In a Subprime Bubble for Used Cars, Borrowers Pay Sky-High Rates." The article highlighted subprime auto lenders it claimed were engaging in many of the same unscrupulous lending and risky investment practices that had led to the mortgage crisis. According to The New York Times, predatory subprime auto lenders were specifically targeting less sophisticated consumers and those in financial distress, loosening credit standards and fabricating loan documentation in order to approve loans to borrowers who could not afford them, and then bundling the loans into securities that could be sold to investors that concealed their true risks.

63.     On July 29, 2014, on Ally's second quarter 2014 earnings conference call, defendant Carpenter disavowed the applicability of the July 19, 2014 New York Times article to Ally's business: "I want to make another editorial comment, if I may, which is we've had a lot of people talking to us about the New York Times article, including, obviously, our regulators. **And I would say in very simple terms, that article does not describe the nature the business that we are in and does not describe the way in which we run our business.**"

64.     In early August 2014, several news organizations reported that two of Ally's main competitors, GM Financial and Santander Consumer USA Holdings Inc., had received subpoenas from the DOJ related to an investigation into their subprime auto lending and securitization activities.

65.     On October 31, 2014, Ally filed its Form 10-Q quarterly financial report for the third quarter with the SEC. Among other things, the Form 10-Q disclosed that the Company had received a subpoena from the SEC "in connection with its investigation related to subprime automotive finance and related securitization activities." As of October 31, 2014, the Company had issued $2.75 billion in three separate subprime auto loan securitizations in 2014.

- 15 -

66.     On December 18, 2014, Ally filed a current report on Form 8-K with the SEC disclosing that the Company had received a subpoena from the DOJ requesting information related to its investigation of Ally's subprime automotive finance and related securitization activities.

67.     That same day, in a press release, Ally announced that the U.S. Treasury would launch the Secondary Offering to sell its remaining stock in the Company to the public, which would allow the Company to exit TARP more than eight years after it received a $17 billion government bailout. In connection with the Secondary Offering, more than 54.9 million shares of Ally common stock were sold to the public at $23.25 per share, generating more than $1.2 billion in proceeds. The U.S. Treasury sold its remaining shares in the Company, marking the end of U.S. government participation in TARP.

68.     On March 26, 2015, the FTC announced the results of Operation Ruse Control, a nationwide, crossborder crackdown on fraudulent and deceptive auto financing practices that the FTC had carried out with 32 law enforcement partners at the federal, state and local level. The FTC announced that Operation Ruse Control encompassed 252 separate enforcement actions in the United States and Canada involving both civil and criminal charges of deceptive advertising, automotive loan application fraud, odometer fraud, deceptive add-on fees and deceptive marketing of car title loans. Among the dealerships involved were several associated with Ally, including, without limitation:

(a)     **Maher Chevrolet (Florida)**. "MAHER failed to disclose all material terms, such as additional fees and costs, in its advertisements of the sale and lease of motor vehicles to consumers. MAHER voluntarily agreed to enter into an Assurance of Voluntary Compliance (AVC)."[2]

(b)     **Matt Blatt Dealerships (New Jersey)**. "[T]he FTC alleged that Matt Blatt dealerships, with multiple locations in New Jersey, violated the FTC Act by failing to disclose or adequately disclose the fees associated with NPN's add-on service and that many consumers would

---

[2]     Quotations are to the FTC's March 26, 2015 press release announcing the results of Operation Ruse Control and its related attachment.

- 16 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

not save money overall due to the program's significant fees. . . . Matt Blatt dealerships also will pay $184,000 to the FTC as part of the settlement."

        (c)    **Ramey Motors (Virginia and West Virginia ).**  "Among other things, Ramey Motors' ads allegedly misrepresented the costs of financing or leasing a vehicle by concealing important terms of the offer, such as a requirement to make a substantial down payment."

        (d)    **David Stanley Dodge (Oklahoma).**  "Complaint alleging advertising violations.  Consent Agreement and Order, $350,000 fine."

        (e)    **Denooyer Chevrolet and DePaula Chevrolet (New York).**  "[F]ound to have advertising practices that were deceptive and misleading.  Agreements to reform advertising practices and pay fines ranging from $7,500 to $15,000."

    69.    In May 2015, Ally received an information request from the New York Department of Financial Services regarding information similar to that requested by the subpoenas issued by the SEC and DOJ regarding Ally's subprime auto loan practices.

    70.    Ally was not accused of any wrongdoing.  Following the disclosure of these various regulatory actions, Ally has repeatedly stated it complies with all laws, employs proper and prudent subprime auto origination and securitization practices and has minimal exposure to subprime credit losses.

    71.    Then, on March 13, 2016, in an article entitled "Subprime Flashback: Early Defaults Are a Warning Sign for Auto Sales," The Wall Street Journal reported on a sharp uptick in subprime auto loan defaults and how these defaults were impacting the performance of bonds backed by securitized subprime auto loans.  The article stated that deteriorating underwriting practices and more liberal credit standards by auto lenders had led to the rising delinquency rate.

    72.    The next day, credit rating agency Fitch Ratings issued a press release stating that subprime auto delinquencies had reached 5.16% of all such loans 60 days or more past due in February, which marked an increase of more than 11% year-over-year, eclipsed 2009 recessionary levels, and constituted the highest delinquency rate in twenty years.

    73.    On April 26, 2016, Ally reported its first quarter 2016 financial results.  The Company revealed that it had begun to significantly pull back on its subprime auto loan originations,

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

to 12.6% of overall originations for the quarter, down from 13.7% the prior quarter, an approximate 8% decrease. On a conference call discussing the results, Ally representatives denied that the pullback had anything to do with a decline in credit quality or the risk of losses from Ally's subprime loan practices.

74.    On June 2, 2016, The Wall Street Journal published an article entitled "J.P. Morgan Chief James Dimon Sounds Alarm on Car Loans." The article reported that Dimon saw subprime risks increasing for auto lenders due to higher default rates and stated that some auto lenders will get "'hurt'" by their subprime practices. Ally's CEO, Jeffrey Brown, was quoted in the article as downplaying the risks to the Company: "'We know fully what we are originating . . . there are no skeletons in the closet.'" The next day, in an article entitled "Auto financiers tapping the brakes on subprime lending," Automotive News reported that Brown had told the organization that Ally was "dialing back on lending to consumers at the lower end of the subprime credit score spectrum."

75.    On June 14, 2016, in an article entitled "Credit-Card Warning Sends Synchrony Shares Dropping," The Wall Street Journal reported that "[c]onsumer credit is starting to fray at the edges," and that "[l]enders and credit-ratings firms are warning . . . auto loans . . . are weakening, suggesting that a new round of borrower delinquencies and losses for financial institutions could be on the way."

76.    On July 11, 2016, in an article entitled "U.S. government worried about risky car loans," CNN Money highlighted a recent report issued by the Office of the Comptroller of the Currency that cited "'unprecedented'" growth in auto loans. The OCC Report found that, "[i]n addition to the easing of underwriting standards and potential layering of risks (higher loan-to-value ratios combined with longer terms), concentrations in auto loans have been increasing," which "elevated risk results in higher probable credit losses." The OCC Report continued: "Supervisory work to date has noted that some banks' risk management practices have not kept pace with the growth and increasing risk in these portfolios."

77.    In a July 28, 2016 blog entitled "Alarm Bells for Auto Loans," The Wall Street Journal reported that several auto lenders, including Ally, had recently raised "concerns about a growing threat to auto-loan performance: signs that used-car values are weakening." The blog stated

- 18 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

that during Ally's second quarter earnings conference call, the Company's CFO, defendant Halmy, had "said pressure on used-car prices could grow as cars getting leased now return to the market in three years." A decline in used-car prices would negatively impact auto lenders such as Ally because it would diminish the value of cars used as loan collateral.

78.     In a September 30, 2016 report, analysts at Sandler O'Neill + Partners reported that "[m]onthly securitization data shows loss rate and delinquency rates rising YoY" for two of Ally's primary securitization platforms, which collectively accounted for 20% of Ally's outstanding retail auto loans.

79.     On October 26, 2016, Ally reported its third quarter 2016 financial results. The Company reported third quarter 2016 EPS of $0.43 and adjusted EPS of $0.56, substantially below consensus EPS estimates of $0.59. A primary driver of the miss was an increase in loan losses for the quarter, which increased by $86 million sequentially (or 50%) to $258 million. As a result, net income declined sequentially by $136 million (or 39%) to $209 million for the quarter. The Company also disclosed that U.S. auto retail net charge-offs had increased 43 basis points sequentially to 1.37%. As a result, net charge-offs had risen in the quarter to $219 million, up from $148 million for the previous quarter, an increase of 48%.

80.     On November 30, 2016, the Federal Reserve Bank of New York issued a report on rising subprime auto delinquencies. The report stated that auto lending companies had dramatically increased subprime lending over the "past few years." The report noted a "deterioration in the performance of subprime auto loans," which translated into households with "roughly six million individuals at least ninety days late on their auto loan payments." As a result, the report cited subprime auto loans as an area "of significant concern" to the economy, which was "likely to have ongoing consequences for affected households."

81.     As recently as November 8, 2016, Ally stock closed at $16.84 per share, more than 32% below the IPO price of $25 per share.

**CLASS ACTION ALLEGATIONS**

82.     Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Ally common stock in or traceable to the IPO (the "Class"). Excluded from the

- 19 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

83.     The members of the Class are so numerous that joinder of all members is impracticable. Ally stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ally or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Ally has more than 470 million shares of stock outstanding.

84.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

85.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Securities Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public in the Offering Documents misrepresented material facts about the business, operations and management of Ally; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

- 20 -

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of §11 of the Securities Act
### Against All Defendants

88.     Plaintiff incorporates ¶¶1-87 by reference.

89.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

90.     This Count does not sound in fraud.  Any preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Plaintiff does not allege that the Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

91.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

92.     Ally is the registrant for the IPO.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

93.     As issuer of the shares, Ally is strictly liable to plaintiff and the Class for any misstatements and omissions.

94.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

95.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

96.     Plaintiff acquired shares of Ally common stock pursuant and/or traceable to the Registration Statement for the IPO.

97.     Plaintiff and the Class have sustained damages.  The value of Ally common stock has declined substantially subsequent to and due to defendants' violations.

- 21 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

## SECOND CAUSE OF ACTION

### For Violation of §12(a)(2) of the Securities Act
### Against All Defendants

98.     Plaintiff incorporates ¶¶1-97 by reference.

99.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §771(a)(2), on behalf of the Class, against all defendants.

100.     By means of the defective Prospectus, defendants promoted and sold Ally stock to plaintiff and other members of the Class.

101.     The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed plaintiff and other members of the Class who purchased Ally common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

102.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time plaintiff acquired Ally common stock.

103.     By reason of the conduct alleged herein, defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Ally common stock by means of the Prospectus sustained substantial damages in connection with their purchases of stock. Accordingly, plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued herein. Class members who have sold their Ally common stock seek damages to the extent permitted by law.

- 22 -

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

## THIRD CAUSE OF ACTION

### For Violation of §15 of the Securities Act
### Against Ally and the Individual Defendants

104.    Plaintiff incorporates ¶¶1-103 by reference.

105.    This Count is brought pursuant to §15 of the Securities Act against Ally and the Individual Defendants.

106.    The Individual Defendants each were control persons of Ally by virtue of their positions as directors and/or senior officers of Ally. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Ally. Ally controlled the Individual Defendants and all of its employees.

107.    Defendants each were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a proper class action;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

Received for Filing Oakland County Clerk 2017 JAN 09 PM 03:34

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 9, 2017                    Respectfully submitted,


                                          /s/ E. Powell Miller
                                          E. Powell Miller (P39487)
                                          Sharon S. Almonrode (P33938)
                                          **THE MILLER LAW FIRM, P.C.**
                                          950 West University Drive, Suite 300
                                          Rochester, MI 48307
                                          Telephone: 248/841-2200
                                          248/652-2852 (fax)
                                          epm@millerlawpc.com
                                          ssa@millerlawpc.com

                                          **ROBBINS GELLER RUDMAN
                                            & DOWD LLP**
                                          SAMUEL H. RUDMAN
                                          58 South Service Road, Suite 200
                                          Melville, NY 11747
                                          Telephone: 631/367-7100
                                          631/367-1173 (fax)

                                          **ROBBINS GELLER RUDMAN
                                            & DOWD LLP**
                                          BRIAN E. COCHRAN
                                          655 West Broadway, Suite 1900
                                          San Diego, CA 92101-8498
                                          Telephone: 619/231-1058
                                          619/231-7423 (fax)

                                          **HARTNETT GLADNEY HETTERMAN LLC**
                                          RONALD C. GLADNEY
                                          4399 Laclede Avenue
                                          St. Louis, MO 63108
                                          Telephone: 314/531-1054
                                          314/531-1131 (fax)

                                          Attorneys for Plaintiff and Proposed Counsel for
                                          the Putative Class

- 24 -